IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-01858-RM-KLM

BLUE SKY CONDOMINIUMS HOMEOWNERS' ASSOCIATION, INC.,

 Plaintiff,

v.

LEXINGTON INSURANCE COMPANY,

 Defendant.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COMPLAINT AND COMPEL ARBITRATION**

  Plaintiff, Blue Sky Condominiums Homeowners' Association, Inc. ("Blue Sky"), by and through its attorneys, Bradley A. Levin, Jeremy A. Sitcoff, and Nelson A. Waneka of ROBERTS LEVIN ROSENBERG PC, states as follows for its Response to Defendant's Motion to Dismiss Complaint and Compel Arbitration [Doc. No. 10]:

## I. INTRODUCTION

  The Federal Arbitration Act ("FAA") treats arbitration agreements similar to other contracts. Like all contracts, arbitration agreements can be waived, and like all contracts, they can stretch no farther than their operative language.

  Here, Lexington's Motion ignores the salient issue: The insurer waived its right to arbitrate when it filed a lawsuit, delayed the proceedings for months, and then received the benefit of Blue Sky's disclosures before changing course and demanding arbitration. As noted by one court and echoed by dozens of others, "invoking judicial process is *presumptive* waiver."

*Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995) (emphasis in original). Lexington intentionally relinquished any right it had to arbitrate, and its actions bear all the indicia of waiver.

But even if the Court does not find waiver, arbitration is still inappropriate. The narrow agreement at issue only contemplates arbitrating "disagreement[s] as to the interpretation" of the insurance policy. Here, by contrast, Blue Sky's claims center on Lexington's bad faith conduct in violating its statutory and common law duties of good faith and fair dealing. The claims thus fall outside the arbitration agreement.

Finally, dismissal of Blue Sky's claims is unwarranted. The law contemplates a court's continuing supervision of the arbitration process in the event of a stay. Outright dismissal, as urged by Lexington, is therefore improvident.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

**A.   The Underlying Action.**

This case arises out of Lexington's bad faith failure to settle a construction defect case styled *Blue Sky Condominiums Homeowners' Association v. VRC Development, LLC et al.,* Weld County Case No. 2008-CV-817 (the "Underlying Action"). Doc. No. 1-1 at ¶15. In that action, Blue Sky alleged that VRC Development, LLC ("VRC") and CFC Residential Constructors, Inc. ("CFC") were responsible for widespread construction defects within the Blue Sky housing complex. *Id.* at ¶¶7-16. When the alleged defects occurred, VRC and CFC were insured under a Commercial General Liability Policy issued by Lexington. *Id.* at ¶8.

As the Underlying Action progressed, it became clear that VRC and CFC faced excess exposure. *See* Doc. No. 1-1 at ¶21. Indeed, Blue Sky alleged that the companies were

responsible for approximately $56,000,000 in damages. *Id.* Nevertheless, in December 2011, Blue Sky made a $13,975,000 demand to settle all of its claims against VRC and CFC. *Id.* at ¶20. Lexington did not accept the offer.

In a letter dated October 30, 2012, Lexington asserted that there were 11,799 separate occurrences giving rise to the alleged construction defects, and because the insurer contended that each occurrence was subject to a $250,000 self-insured retention, it claimed that no coverage was owed under the policy. *Id.* at ¶¶23-24; **Exhibit A**. Lexington also asserted that certain policy exclusions precluded coverage. *Id.* In four separate places within the letter, Lexington said that a "Colorado court" would likely take its side on the coverage issues. *Id.*

In January 2013, Blue Sky reduced its demand to $9,000,000. Doc. No. 1-1 at ¶26. The day the demand expired, Lexington advised that it was willing to contribute just $1,000,000 towards settlement. *Id.* at ¶28; **Exhibit B**. Blue Sky subsequently lowered its demand to $8,975,000, but Lexington maintained its position. Doc. No. 1-1 at ¶29-30.

On Friday, February 8, 2013, with a jury trial set to commence the following Monday, in order to protect themselves from further adverse consequences VRC and CFC resolved the Underlying Action through an agreement which, in part, assigned their claims for bad faith breach of insurance contract to Blue Sky. *Id.* at ¶31. One minute before Blue Sky's offer was set to expire, and only after learning that VRC and CFC intended to protect their interests, Lexington offered $3,000,000. *Id.* at ¶34; **Exhibit C**.

**B.  Lexington Races To The Courthouse.**

The same afternoon it belatedly increased its offer, Lexington filed a complaint for declaratory judgment in this Court (the "Declaratory Judgment Action"). *Id.*; **Exhibit D**. The

21-page complaint rehashed Lexington's previous coverage position and repeatedly requested that the Court declare and adjudicate various coverage questions in its favor. Ex. D at 18-20. Nowhere did Lexington indicate that it wished to arbitrate. *See* Ex. D.

Blue Sky learned of the complaint shortly after it was filed, but Lexington failed to serve it. Declaration of Bradley A. Levin attached as **Exhibit E**; Doc. No. 1-1 at ¶36. For months, Blue Sky's counsel implored Lexington's two sets of attorneys to forward a waiver and acceptance of service of the complaint, so that Blue Sky could promptly file its answer and counterclaims and the litigation could proceed forward. Ex. E. While Lexington's counsel demurred and offered varying excuses for the delay, they never indicated that the insurer was contemplating arbitration. *Id.* Meanwhile, the Court assigned a judge and issued preliminary orders. **Exhibit F**.

**C.  Lexington Changes Its Mind.**

On May 10, 2013, more than three months after filing its complaint, Lexington voluntarily dismissed the Declaratory Judgment Action. Doc. No. 1-1 at ¶37; Ex. F at Doc. No. 8. Four days later, it demanded arbitration. Doc. No. 1-1 at ¶38; **Exhibit G**. Because Lexington had waived any right to arbitrate, Blue Sky declined the insurer's request. **Exhibit H**.

On June 12, 2013, Blue Sky filed its complaint in Denver District Court. Doc. No. 1-1. Rather than seeking to compel arbitration, Lexington waited until it received Blue Sky's initial disclosures and then removed the case. Doc. No. 1; **Exhibit I**. Only then, more than five months after it filed the Declaratory Judgment Action, and after invoking this Court's jurisdiction for a second time, did Lexington endeavor to compel arbitration.

4

## III. ARGUMENT

A. **Lexington Waived Any Right It Had To Arbitrate.**

1. **Waiver Is An Issue For The Court, Not The Arbitrator.**

A threshold question is whether a court or an arbitrator determines if a party has waived its right to arbitrate. Most federal courts have held that the court resolves such claims. *See JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388, 394 (6th Cir. 2008); *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 217 (3d Cir. 2007); *Price v. Random House, Inc.*, No. 07-CV-01347, 2009 WL 3415821, *6 (D. Colo. Oct. 16, 2009). Indeed, under the FAA, a court is only required to compel arbitration if "the applicant for the stay is not in *default* in proceeding with such arbitration." 9 U.S.C. § 3 (emphasis added). In this context, courts interpret the term "default" to mean "waiver." *Ehleiter*, 482 F.3d at 218. Thus, the FAA itself provides for a court's determination of litigation-based waiver.

2. **Lexington Intentionally Relinquished Any Right It Had To Arbitrate.**

Despite favorable federal policy, the right to arbitration, like any other contractual right, can be waived. *Reid Burton Const., Inc. v. Carpenters Dist. Council of Southern Colo.*, 614 F.2d 698, 702 (10th Cir. 1980). The first (and potentially the last) step in the waiver analysis is determining whether the party seeking arbitration intentionally relinquished the right to arbitrate. *Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 773 (10th Cir. 2010) ("To begin with, a party should not be permitted to demand arbitration when it has previously waived its right to arbitration in the narrow sense of waiver typically used in the criminal-law context, where a waiver is an intentional relinquishment or abandonment of a known right.") (quotation omitted).

Dozens of courts have held that a party's commencement of litigation is inconsistent with

the right to arbitrate and results in a waiver of that right. *See, e.g., Erdman Co. v. Phoenix Land & Acquisition, LLC*, 650 F.3d 1115, 118 (8th Cir. 2011); *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002); *Grumhaus v. Comerica Secs., Inc.*, 223 F.3d 648, 651 (7th Cir. 2000); *Kraftmaid*, 50 F.3d at 390; *S&H Contractors, Inc. v. A.J. Taft Coal Co., Inc.*, 906 F.2d 1507, 1514 (11th Cir. 1990); *Miller Brewing Co. v. Forth Worth Distrib. Co., Inc.*, 781 F.2d 494, 496-98 (5th Cir. 1986); *Illinois Concrete-I.C.I., Inc. v. Storefitters, Inc.*, 922 N.E.2d 542, 547 (Ill. App. Ct. 2010); *Getz Recycling, Inc. v. Watts*, 71 S.W.3d 224, 229 (Mo. Ct. App. 2002).[1]

*Erdman* is particularly instructive. 650 F.3d at 1117-20. In that case, Erdman Company ("Erdman") and Erdman Architecture & Engineering Company ("EAEC") filed a complaint in federal court to foreclose on several liens. *Id.* at 1116. When the defendant asserted counterclaims, Erdman and EAEC moved to compel arbitration. *Id.* at 1117. The district court declined to stay the case, and the Eighth Circuit Court of Appeals affirmed. *Id.* at 1117-20. While recognizing the federal policy in favor of arbitration, the appellate court nevertheless concluded that Erdman and EAEC had waived any right to arbitrate by filing the lien action. *Id.*

> [U]nlike many waiver cases, where a defendant responded to the plaintiff's lawsuit and, at some point, asserted its right to arbitrate, Erdman and EAEC initiated the lawsuit . . . . In our view, that was an election sufficient to support the district court's finding that Erdman acted inconsistently with the right to arbitrate.

*Id.* at 1118. The court found that, in order to safeguard its right to arbitration, "a party must do

---

[1] *See also Kenyon Intern. Emergency Servs., Inc. v. Malcolm*, No. H-09-3550, 2010 WL 2303328, *4 (S.D. Texas June 7, 2010); *Price*, 2009 WL 3415821 at *7; *Coxcom, Inc. v. Egghead Telecom, Inc.*, No. 08-CV-698, 2009 WL 4016629, *6 (N.D. Okla. Sept. 11, 2009); *Blackburn v. Citifinancial, Inc.*, No. 05AP-733, 2007 WL 927222, *5 (Ohio Ct. App. March 29, 2007); *Elite Home Remodeling, Inc. v. Lewis*, No. 14-06-37, 2007 WL 730072, *3 (Ohio Ct. App. March 12, 2007); *Checksmart v. Morgan*, Case No. 80856, 2003 WL 125130, *1-2 (Ohio Ct. App. Jan. 16, 2003); *Multicare Physicians & Rehabilitation Group, PC v. Wong*, No. 017005, 2006 WL 2556584, *2 (Conn. Super. Ct. Aug. 15, 2006); *Framan Mechanical, Inc. v. Lakeland Regional High School Bd. of Educ.*, No. L-3972-04, 2005 WL 2877923, *1 (N.J. Super. Ct. App. Div. Nov. 3, 2005).

all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration." *Id.*

*Grumhaus* provides further guidance. 223 F.3d at 650-53. There, members of the Grumhaus family filed a complaint to compel arbitration of their dispute with the defendant. *Id.* at 650. After briefing this issue, the Grumhauses filed an amended complaint adding substantive claims. *Id.* The family then sought to compel arbitration of the new claims, and the district court ordered a stay of the proceedings. *Id.* In reversing, the Seventh Circuit Court of Appeals reasoned that the Grumhauses had waived their ability to arbitrate the substantive claims by filing their amended complaint. *Id.* at 650-53. The court held that "this knowing selection of one forum over another and willing participation in the ensuing litigation was plainly inconsistent with a desire to arbitrate." *Id.* at 651. The court noted that "[a] party may not normally submit a claim for resolution in one forum and then, when it is disappointed with the result in that forum, seek another forum." *Id.*

*Getz Recycling* holds similarly. 71 S.W.3d at 229-31. In that case, regarding rights under an equipment lease, Getz filed an action for replevin, injunction, and declaratory relief. *Id.* at 226-27. Less than a month after the defendant asserted counterclaims, Getz filed a motion to stay the proceedings and enforce arbitration. *Id.* at 227. In affirming the district court's denial of stay, the appellate court focused on Getz's knowledge of the arbitration agreement, and its election to nevertheless initiate legal proceedings. *Id.* at 229-30.

> In this case, there is no question that Getz had knowledge of its right to arbitrate, given that it drafted the agreement. There is also no question that Getz acted inconsistently with its right to arbitrate, given that it first initiated suit . . . .

*Id.* at 229. The court determined that, even though the litigation had not substantially progressed

when Getz sought to compel arbitration, its commencement of the litigation deprived the defendant of the main goals of arbitration: a speedy and low-cost resolution. *Id.* at 231.

As in *Erdman*, *Grumhaus*, *Getz Recycling*, and the other cases cited above, here there can be no question that Lexington's initiation of the Declaratory Judgment Action was an intentional relinquishment of any right it had to arbitrate. First, as drafter of the insurance policy, Lexington was clearly aware of any arbitration right therein. Second, the insurer's initiation of the Declaratory Judgment Action was the ultimate abandonment of that right. Indeed, "[t]here is no clearer manifestation of an intent to use judicial process than filing a lawsuit." *Grant & Assocs. v. Gonzales*, 135 Wash.App 1019, *4 (Wash. Ct. App. 2006).

Lexington's complaint declared three times that it was asking the Court to adjudicate the very controversy it now seeks to arbitrate. Ex. D at 18-20. Furthermore, the insurer said nothing of arbitration for three months after VRC, CFC, and Blue Sky were apprised of the complaint. This is no less a waiver than had Lexington sent a letter to the parties expressly disavowing its right to arbitrate and stating that it was instead electing to proceed in litigation.

Now that Lexington has intentionally relinquished any right it had to arbitrate, neither the FAA nor the federal policy in favor of arbitration allows it to unring the bell.

> **3. Even If Lexington Did Not Intentionally Relinquish Its Right To Arbitrate, Its Conduct Still Amounts To A Waiver.**

In *Ricoh*, the Tenth Circuit Court of Appeals held that a party's waiver of the right to arbitrate is not limited to the intentional relinquishment of that right. 603 F.3d at 773. Rather, waiver can result from a party's negligence, failure to act, or other conduct. *Id.* Six non-exclusive factors inform the analysis in such cases:

> (1) whether the party's actions are inconsistent with the right to

arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing parties.

*Id.* at 772-73. The factors are not intended to be evaluated in a mechanical fashion, where each factor is assessed and the side with the greater number of favorable factors prevails. *Id.* at 773. Furthermore, a concern enveloping all of the factors is whether the party seeking arbitration is improperly manipulating the judicial process.[2] *Id.*

Here, the above factors indicate that Lexington waived any right it had to arbitrate this matter. With respect to the first factor, as previously explained, Lexington's initiation of the Declaratory Judgment Action was patently inconsistent with its right to arbitrate. *See MedQuist*, 301 F.3d at 637 ("Litigating a claim is clearly inconsistent with any perceived right to arbitration; we do not want parties to forum shop, taking a case to the courts and then, when things go poorly there, abandoning their suit in favor of arbitration.").

Concerning the second factor, by its actions Lexington substantially invoked the judicial process. This matter has been before two courts and three judges. Each judge has entered preliminary orders, however minor. Time and resources have been spent on docketing and reviewing the various filings. Lexington's commencement of the Declaratory Judgment Action,

---

[2] "Another important consideration is maintenance of the combined efficiency of the public and private dispute resolution systems." *Id.* at 774. In this respect, the Tenth Circuit has stated that "[s]election of a forum in which to resolve a legal dispute should be made at the earliest possible opportunity in order to economize resources, both public and private, consumed in dispute resolution." *Id.* (*quoting Kraftmaid*, 50 F.3d at 391).

9

without more, is a substantial invocation of the litigation process. *See Erdman*, 650 F.3d at 1118 ("A party substantially invokes the litigation machinery when, for example, it files a lawsuit on arbitrable claims.").

The third factor also suggests waiver. Although Lexington did not raise arbitration on the eve of trial, it did delay for a long period before seeking a stay of the proceedings. Lexington commenced the Declaratory Judgment Action more than six months ago. It made no mention of arbitration in its complaint (as it could have), it did not seek a stay in that action (because it initiated the lawsuit), and it did not seek a stay when Blue Sky reinstituted the litigation in state court (because it wanted a favorable federal forum). These strategic decisions to gain a procedural advantage have greatly delayed the proceedings and undermined the efficiencies of arbitration. *See Getz Recycling*, 71 S.W.3d at 231. Clearly, Lexington did not select the forum it now desires "at the earliest possible opportunity." *See Ricoh*, 603 F.3d at 774.

With respect to the fourth factor, Lexington's filing of a complaint without enforcing its policy's arbitration clause is functionally identical to a defendant's assertion of counterclaims without seeking a stay. In each circumstance, a party is affirmatively invoking a court's jurisdiction in contradiction of the right to arbitrate. *See, e.g., Robinson v. Food Service of Belton, Inc.*, 415 F.Supp.2d 1221, 1226 (D. Kansas 2005) ("Defendant's counterclaim, filed with no request for a stay in the proceedings, exemplifies defendant's use of the federal court system to hash out legal issues which arbitration would resolve or preclude.").

As to the fifth factor, important intervening steps have taken place which could prejudice Blue Sky if it is forced to arbitrate. Specifically, Lexington received the benefit of Blue Sky's initial disclosures—without providing its own—before removing the case and seeking a stay of

the proceedings. Receipt of the disclosures was advantageous to the insurer because the information provided therein were not necessarily available to it in arbitration. *See* Doc. No. 10-3 at 33 (providing for the exchange of information in complex commercial cases at the discretion of the arbitrator); *Waldman v. Old Republic Nat. Title Ins. Co.*, 12 P.3d 835, 837-38 (Colo. App. 2000) (finding prejudice where party seeking to compel arbitration received discovery in litigation that was only available at the discretion of the arbitrator).

Concerning the sixth factor, Lexington's conduct prejudiced Blue Sky. Blue Sky expended substantial time and resources in evaluating the Declaratory Judgment Action and repeatedly communicating with the insurer's counsel concerning the delays in proceeding with that action. Blue Sky has been required to address Lexington's spurious arbitration demand and to initiate state court proceedings that were ultimately removed to this Court. Meanwhile, Blue Sky had to draft and file initial disclosures in state court. Furthermore, Blue Sky spent a significant amount of time and resources researching and responding to the instant Motion. Added to this is the now six-month delay in the proceedings attendant to Lexington's failure to elect arbitration as its initial forum. As noted by the Eighth Circuit in *Erdman*, "the prejudice threshold . . . is not onerous." 650 F.3d at 1119. Here, it is clearly met.

Also concerning the sixth factor, Lexington's actions during the three-month period between its initiation and voluntary dismissal of the Declaratory Judgment Action were, at best, disingenuous if not misleading. By initiating the Declaratory Judgment Action the day VRC and CFC resolved the Underlying Action, Lexington was sending an unmistakable message that it believed a court would side with its coverage position. Blue Sky repeatedly communicated with the insurer regarding the delay in serving the complaint, and at no time did Lexington reveal an

intent to invoke arbitration. Presumably, the insurer's stratagem was to file the Declaratory Judgment Action in order to win the proverbial race to the courthouse and then, after evaluating the outcome of that course of action, to determine over the next several weeks whether it would be more advantageous for it to seek relief in an arbitral forum. As the Seventh Circuit Court of Appeals has observed, "[t]hat is the worst possible reason for delay." *Kraftmaid*, 50 F.3d at 391. "It amounts to saying that [Lexington] wanted to see how the case was going in federal district court before deciding whether it would be better off there or in arbitration. It wanted to play heads I win, tails you lose." *Id.*

**B.      Blue Sky's Claims Are Not Arbitrable.**

Because Lexington has waived its right to arbitration, the Court need not address whether Blue Sky's claims fall within the scope of the arbitration agreement. Should the Court not find waiver, however, arbitration is still inappropriate because Blue Sky's claims are not arbitrable.

   **1.      The Parties Did Not "Clearly And Unmistakably" Reserve Arbitrability For The Arbitrator.**

The question of whether a dispute is arbitrable is to be resolved by the court unless the parties "clearly and unmistakably provide otherwise." *Spahr v. Secco*, 330 F.3d 1266, 1269-70 (10th Cir. 2003). Ambiguities concerning this question are resolved in favor of judicial resolution. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920 (1995).

Here, Lexington suggests that the agreement's incorporation of the Commercial Arbitration Rules of the American Arbitration Association ("AAA") is clear and unmistakable evidence that the parties intended to submit the issue of arbitrability to the arbitration panel. In stark contrast to the cases cited by Lexington, however, the arbitration agreement here does not incorporate the AAA rules in their entirety. Instead, the agreement states: "The *procedural* rules

applicable to this arbitration shall, except as provided otherwise herein, be in accordance with the Commercial Arbitration Rules of the American Arbitration Association." Doc. No. 10-2 at 30 (emphasis added).

AAA Rule-7, which grants the arbitrator the ability to determine its jurisdiction, is substantive and, therefore, is not incorporated into the agreement for purposes of depriving the court of its role in deciding arbitrability issues. *United Parcel Serv. v. Lexington Ins. Group*, No. 12 Civ. 7961, 2013 WL 1897777 (S.D.N.Y. May, 7, 2013). At the least, there is an ambiguity concerning whether AAA Rule-7 is procedural or substantive and, accordingly, this Court should determine which issues, if any, are subject to arbitration. *See* Doc. No. 10-3 (identifying certain clauses as "procedures" and others as "rules").

> **2.    Blue Sky's Claims Are Not "A Disagreement As To The Interpretation" Of The Insurance Policy.**

Construing the scope of an arbitration agreement, the first step is to classify the particular agreement as either broad or narrow. *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1196 (10th Cir. 2009). A broad arbitration clause encompasses any and all disputes arising out of the contract, while a narrow clause limits arbitration to specific disputes. *Id.* "Under a narrow arbitration clause, a dispute is subject to arbitration only if it relates to an issue that is on its face within the purview of the clause . . . ." *Id.* When evaluating narrow arbitration clauses, the liberal policy in favor of arbitration does not create a presumption of arbitrability. *Id.*

Here, the narrow agreement only provides for the arbitration of "disagreement[s] as to the interpretation of [the] policy." Doc. No. 10-2 at 30. Blue Sky's claims, however, are predicated on Lexington's bad faith conduct in failing to settle the Underlying Action and are primarily

13

informed by statutory and common law duties extrinsic to the policy. *See Goodson v. American Standard Ins. Co.*, 89 P.3d 409, 414 (Colo. 2004) (explaining insurer's duties in third-party context); C.R.S. § 10-3-1104(1)(h) (2012) (listing unfair claims settlement practices). Indeed, Lexington's potential liability does not come from its breach of an express contractual obligation, as in many insurance cases, but from its breach of settlement and other obligations implied in law which exist independently of the insurer's interpretation of the policy. *See Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141-42 (Colo. 1984). Because Blue Sky's claims cannot be fairly characterized as a "disagreement as to the policy's interpretation," those claims are not arbitrable.

Furthermore, in the Motion, Lexington suggests that resolution of Blue Sky's claims depends upon multiple interpretations of the policy, including whether the construction defects in the Underlying Action qualify as property damage, whether the alleged damages are excluded, whether there were 11,799 separate occurrences, and the extent of the applicable limits of liability. Doc. No. 10 at 12. Even assuming that each of these contentions requires an interpretation of the policy, as opposed to the application of facts to the policy as written, this does not transform the entire action into a "disagreement as to the policy's interpretation." At best, while the individual "disagreements" identified by Lexington are potentially arbitrable, the entirety of Blue Sky's claims, and in particular its allegations of bad faith handling of the Underlying Action, are not. *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155-56 (Del. 2002) (claims which are factually related to but legally distinct from the contract fall outside the scope of an arbitration agreement pertaining solely to the contract).

14

## C. Dismissal Of Blue Sky's Claims Is Not An Appropriate Remedy.

While Section 3 of the FAA requires a court to stay litigation when claims are properly referable to arbitration, it does not provide for dismissal of the case. Rather, the Tenth Circuit Court of Appeals has held that "Section 3 of the Federal Arbitration Act contemplates continuing supervision by the district court to ensure that arbitration proceedings are conducted within a reasonable period of time, thus preventing any impairment of the plaintiff's rights to seek relief." *Meyer v. Dans un Jardin, S.A.*, 816 F.2d 533, 539-40 (10th Cir. 1987). Because dismissal is improvident, should the Court grant a stay with respect to any of Blue Sky's claims, it should retain its jurisdiction in order to monitor the progress of arbitration.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Blue Sky Condominiums Homeowners' Association, Inc., respectfully requests that the Court deny Defendant Lexington Insurance Company's Motion to Dismiss Complaint and Compel Arbitration.

Dated this 21st day of August 2013.

Respectfully submitted,

*/s/ Nelson A. Waneka*
Bradley A. Levin
Jeremy A. Sitcoff
Nelson A. Waneka
ROBERTS LEVIN ROSENBERG PC
1512 Larimer Street, Ste. 650
Denver, Colorado 80202
(303) 575-9390
(303) 575-9385
bal@robertslevin.com
jas@robertslevin.com
naw@robertslevin.com
**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of August 2013, a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COMPLAINT AND COMPEL ARBITRATION** was electronically filed with the Clerk of the Court using the CM/ECF system and served on the following by the method indicated which will send notification of said filing to the following e-mail addresses:

X  via CM/ECF

Maxine Martin, Esq.
PATTON BOGGS LLP
msmartin@pattonboggs.com

Mark. D. Sheridan, Esq.
Mark C. Errico
PATTON BOGGS LLP
msheridan@pattonboggs.com
merrico@pattonboggs.com

*s/ Nicole R. Peterson*
Nicole R. Peterson
**ROBERTS LEVIN ROSENBERG PC**
1512 Larimer Street, Ste. 650
Denver, CO 80202